**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| REPUTATION.COM, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 21-129-LPS-CJB |
| | ) | |
| BIRDEYE, INC. | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

In this patent action filed by Plaintiff Reputation.com, Inc. ("Reputation" or "Plaintiff")

against Defendant Birdeye, Inc. ("Birdeye" or "Defendant"), presently pending before the Court

is Defendant's motion to dismiss, filed pursuant to Federal Rule of Civil Procedure 12(b)(6)

("Motion"). (D.I. 44) For the reasons set forth below, the Court recommends that the Motion be

GRANTED.

## I.      BACKGROUND

### A.      Factual Background

In the operative First Amended Complaint ("FAC"), Plaintiff accuses aspects of

Defendant's reputation management platform of infringing at least claims 1, 12 and 16 of United

States Patent No. 8,918,312 (the "'312 patent"), at least claims 18, 31 and 32 of United States

Patent No. 10,180,966 (the "'966 patent"), at least claims 13 and 14 of United States Patent No.

10,354,296 (the "'296 patent") and at least claims 19, 30 and 31 of United States Patent No.

10,445,794 (the "'794 patent"). (D.I. 33 at ¶¶ 116-71) Further relevant facts related to

resolution of the Motion will be set out as needed in Section III.

### B.      Procedural Background

Plaintiff filed its original Complaint on February 1, 2021.  (D.I. 1)  The FAC was filed on

April 27, 2021.  (D.I. 33)  On May 18, 2021, United States District Judge Leonard P. Stark

referred the case to Court to hear and resolve all pre-trial matters up to and including expert

discovery matters.  (D.I. 50)

The instant Motion was filed on May 11, 2021, (D.I. 44), and briefing was completed on

June 1, 2021, (D.I. 57).  The Court heard oral argument on the Motion at a hearing ("the

hearing") held on October 29, 2021.  (*See* Transcript of October 29, 2021 Hearing, or "Tr.")[1]

## II.    LEGAL STANDARD

The instant Rule 12(b)(6) Motion is premised on Defendant's assertion that the FAC

should be dismissed due to the applicability of an affirmative defense:  that the patent claims-in-

suit are directed to patent-ineligible subject matter pursuant to 35 U.S.C. § 101 ("Section 101").

The Court has often set out the relevant legal standards for review of such a Rule

12(b)(6)/Section 101 motion, including in *Genedics, LLC v. Meta Co.*, Civil Action No. 17-

1062-CJB, 2018 WL 3991474, at *2-5 (D. Del. Aug. 21, 2018).  It hereby incorporates by

reference its discussion in *Genedics* of these relevant legal standards and will follow this legal

guidance in assessing the Motion.  To the extent that other, related legal principles are relevant to

the Motion, the Court will discuss those below in Section III.

## III.    DISCUSSION

There are four patents-in-suit implicated by the instant Motion.  The Court will address

them in turn.

### A.    The '296 Patent

---

[1]    At that same hearing, the Court also heard argument on Plaintiff's motion for
preliminary injunction.  (D.I. 48)  The Court recently recommended that this preliminary
injunction motion be denied on unrelated grounds.  (D.I. 123)

The '296 patent is entitled "Follow-up Determination." ('296 patent at 1)[2]  Generally speaking, it relates to following up with a potential online review author if that person has not yet authored a review.  The Court will assess the eligibility only of asserted claim 13, as it considers that claim to be representative.[3]  Claim 13 recites the following:

> **13.** A method, comprising:
>
> facilitating, by an interface, a transmission of a review request to a potential author of a review on a review site, wherein the review request is included within a first electronic message;
>
> determining, by a follow-up engine configured to monitor the review site, that the potential review author has not, subsequent to the transmission, authored a review on the review site monitored by the follow-up engine, and in response determining a follow-up action to take with the potential review author regarding the review request, wherein determining the follow-up action to take includes determining that a modification should be made to the first electronic message, and wherein determining that the modification should be made includes at least one of:  (1) determining that a subject of the first electronic message should be modified, and (2) determining that content of the first electronic message should be modified; and
>
> performing the determined follow-up action, wherein performing the determined follow-up action includes sending a second electronic message, and wherein the second electronic message corresponds to a modified version of the first electronic message.

('296 patent, col. 25:31-54)

> **1.** *Alice*'s Step One

---

[2]    All four patents-in-suit are attached as exhibits to the FAC.  (D.I. 33, exs. A-D)  Herein, the Court will cite to the patents by their patent number.

[3]    Defendant's view is that claim 13 is representative as to this patent.  (Defendant's Hearing Presentation, Slide 2)  In its answering brief, Plaintiff does not take issue with this assertion.  (D.I. 55 at 7-14; D.I. 57 at 2 n.2)  The Court, therefore, will treat claim 13 as representative of the asserted claims of this patent.

The Court first assesses *Alice*'s step one, which asks whether the claim at issue is "directed to" an abstract idea. What is an abstract idea? It can be (but is not necessarily limited to) a "preexisting, fundamental truth" that "exis[ts] in principle apart from any human action[,]" or it can be a "method of organizing human activity" (such as a "longstanding commercial practice"). *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 220 (2014) (internal quotation marks and citations omitted); *see also DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1256-57 (Fed. Cir. 2014). A claim to an abstract idea has been described by the United States Court of Appeals for the Federal Circuit as one directed to a "'disembodied' concept . . . a basic building block of human ingenuity, untethered from any real-world application." *CLS Bank Int'l v. Alice Corp. Pty. Ltd.*, 717 F.3d 1269, 1286 (Fed. Cir. 2013) (Lourie, J., concurring) (citation omitted). Beyond that, the "abstract ideas" category has not been crisply defined, *see Alice*, 573 U.S. at 221 (declining to "labor to delimit the precise contours of the 'abstract ideas' category"), and the Supreme Court of the United States and the Federal Circuit have found it sufficient to compare claims at issue to those claims already found to be directed to an abstract idea in previous cases, *see Enfish LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016).

Defendant argues that claim 13 is directed to the abstract idea of "requesting that an individual write a review of a business and sending a follow-up message if they do not write a review." (D.I. 45 at 7; Defendant's Hearing Presentation, Slide 15) This is so, Defendant notes, because "[it] broadly claim[s] an abstract result, without reciting a technological solution to any technological problem[,]" (D.I. 45 at 9), and simply contains "functional, results-oriented limitations[,]" (Defendant's Hearing Presentation, Slide 18 (emphasis omitted)). (*See also* D.I. 45 at 9-10; Tr. at 247-48) In effect, in Defendant's view, "[t]he claims attempt to monopolize

the mere transfer of information[.]"  (Defendant's Hearing Presentation, Slide 18; *see also* D.I. 57 at 8)

In response, Plaintiff does not dispute that "requesting that an individual write a review of a business and sending a follow-up message if they do not write a review" is an abstract idea. But it argues that claim 13 is not actually "directed to" that concept.  (D.I. 55 at 7-11; *see also* D.I. 109-1 at 14)  Plaintiff asserts that the claim is instead "directed to improvements to the capability [of] the systems that support online reviews and reputation management systems as a whole[.]"  (D.I. 55 at 18)

So *is* claim 13 actually directed to the abstract idea at issue?  When one looks at the claim's language, it sure seems so.  Most of the content in claim 13 describes a method that:  (1) sends a request via an electronic message to a potential review author asking them to author a review on a specific review website; (2) later determines that the potential review author has not in fact authored a review on the specific website; (3) also determines that a follow-up action is needed; and (4) sends a (modified) follow-up email to the potential review author.  ('296 patent, col. 25:31-54)  These components of the claim largely consist of functional language, and describe a high-level process of collecting and analyzing information—as opposed to any particular assertedly inventive technology used to perform those functions.  *See Elec. Power Grp. v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016).

The specification also supports Defendant's argument.[4]  The title of the patent ("Follow-up Determination") suggests that it is simply about the concept of following up with a reviewer

---

[4]      In order to determine what a patent claim is really "directed to" at step one, the Federal Circuit has encouraged district courts to consider the content of the patent's specification.  *Cf. Enfish*, 822 F.3d at 1337 (indicating that it is appropriate to look to a patent's specification to determine whether a claim of the patent is "directed to" a particular concept, and that if a claim contains a particular element that is described by the patent's specification as what

to make sure they write a review.  Moreover, the patent's Abstract very neatly tracks the outline

of the asserted abstract idea (and does not suggest that some more specific, real-world

application of that idea is at play):

> The transmission of a review request to a potential author of a
> review of a review site is facilitated.  A determination is made that
> the potential reviewer has not, subsequent to the transmission,
> authored a review on the review site.  A follow-up action to take
> with the potential reviewer regarding the review request is
> determined.

('296 patent at Abstract)  And while the specification describes a problem that the invention is

meant to help fix (i.e., the fact that "both positive and negative reviews posted to a review

website can impact revenue" but that "it is becoming increasingly difficult for businesses to

monitor [review web]sites"), the Court does not see where it ever describes a specific,

*technological* solution to that problem.  (*Id.*, col. 1:24-25, 27-28)

 Nor is Plaintiff's step one argument to the contrary very persuasive.  In its briefing,

Plaintiff describes the problem the patent means to address as follows:  "many potential

reviewers simply ignore review requests and others decline to take the time to proceed to a

review website to provide a review."  (D.I. 55 at 8 (citing D.I. 33 at ¶ 29))  Plaintiff then offers

that the way the patent addresses that issue is by "facilitating transmission of a review request to

an individual who has patronized the business, and then determining whether follow-up is

necessary (including by modifying the subject of the original request)."  (*Id.* (citing D.I. 33 at ¶

---

the "present invention comprises[,]" this suggests that the claim may be directed to that element
or concept) (internal quotation marks and citation omitted); *Internet Patents Corp. v. Active
Network, Inc.*, 790 F.3d 1343, 1348 (Fed. Cir. 2015) (same, and noting that if a concept is
described in the patent as being "the innovation over the prior art" or the "essential, most
important aspect" of the patented invention, that suggests that the claim is directed to that
concept) (internal quotation marks and citation omitted).

30))  But that is largely just a restatement of the abstract idea at issue.  And though Plaintiff's counsel argued that the "patent as a whole is clearly trying to solve technological problems" by way of an "improved review request functionality[,]" counsel never persuasively pointed to claim language that describes how the invention accomplishes this by way of promoting a technological solution to those problems.  (Tr. at 277); *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016) (noting that at step one, a court looks to whether the claims "focus on a specific means or method that improves the relevant technology or are instead directed to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery"); *Enfish*, 822 F.3d at 1335-36 (noting that at step one, a court asks "whether the focus of the claims is on a specific asserted improvement in computer capabilities . . . or, instead, on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool").[5]

---

[5]     Plaintiff's other step one arguments are not availing.  For example, Plaintiff asserts that claim 13 must not be directed to an abstract idea because "[i]n effect, the '296 [p]atent as a whole helps the systems of online reviews and online reputation management work better" or because Defendant "presented no evidence that the processes previously used by businesses soliciting reviews are the same as the process required by the claims." (D.I. 55 at 8-9) But just because use of a claimed method might lead to a helpful, or even novel, outcome does not necessarily mean that the claim is patent eligible.  If that claim is one to an abstract idea (as opposed to a specific, real-world application of that idea) then its potential usefulness or its novelty will not save it.  *See Ficep Corp. v. Peddinghaus Corp.*, Civil Action No. 19-1994-RGA, 2021 WL 254104, at *3 (D. Del. Jan. 26, 2021), *report and recommendation adopted*, 2021 WL 979564 (D. Del. Mar. 16, 2021).

Additionally, Plaintiff argues that the claim cannot be directed to an abstract idea because it "provides [a] solution to problems rooted in online reputation management technology" and is not "directed to performance of some business practice known in the pre-Internet world[.]"  (D.I. 55 at 9)  Yet "limiting the use of an abstract idea to a particular technological environment" does not make a claim any less abstract.  *Alice*, 573 U.S. at 223 (internal quotation marks and citations omitted); *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1320 (Fed. Cir. 2016) ("[P]erformance of an abstract idea on the Internet is abstract[.]").  Now, if the claim was really directed to a solution "rooted in computer technology[,]" as the FAC asserts in conclusory fashion, (D.I. 33 at ¶ 34), then it would likely pass muster under step one.  The reality, however,

For the above reasons, the Court agrees with Defendant that claim 13 is directed to an abstract idea.  (D.I. 45 at 9); *see also Glasswall Sols. Ltd. v. Clearswift Ltd.*, 754 F. App'x 996, 998 (Fed. Cir. 2018).  The Court thus moves to step two of the inquiry.

### 2.    *Alice*'s Step Two

If a claim *is* directed to an abstract idea, then step two of the *Alice* framework requires a court to assess "[w]hat else is there in the claims"; a court does so by considering "the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements transform the nature of the claim into a patent-eligible application."  *Alice*, 573 U.S. at 217 (internal quotation marks and citation omitted).  The Supreme Court describes step two as a search for an "inventive concept"—"*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself."  *Id.* at 217-18 (internal quotation marks and citation omitted); *see also Berkheimer v. HP Inc.*, 881 F.3d 1360, 1367 (Fed. Cir. 2018).  The purpose of the "inventive concept" requirement is to "ensure that the claim is more than a drafting effort designed to monopolize the abstract idea."  *Alice*, 573 U.S. at 221 (internal quotation marks, citation, and brackets omitted).[6]

---

is that claim 13 is focused on an abstract idea—one that simply happens to be utilized in an Internet-based environment.

[6]    Simply stating an abstract idea and then adding the words "apply it with a computer" (or the equivalent thereof) will not transform an abstract idea into a patent-eligible invention.  *Alice*, 573 U.S. at 223 (internal quotation marks omitted).  And the additional elements within the claim, apart from the abstract idea itself, must involve more than "'well-understood, routine, conventional activit[ies]' previously known to the industry."  *Id.* at 225 (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 73 (2012)); *see also Mayo*, 566 U.S. at 82 ("[S]imply appending conventional steps, specified at a high level of generality, to . . . abstract ideas cannot make those . . . ideas patentable.").

In exploring this step two question, the Court is mindful that although a determination of patent eligibility is ultimately an issue of law, the determination may involve "disputes over underlying facts." *Berkheimer*, 881 F.3d at 1368. One such factual issue is "[w]hether [a claim element or claimed combination] is well-understood, routine, and conventional to a skilled artisan at the time of the patent[.]" *Id.* at 1369.[7]

In its answering brief, Plaintiff never really clearly states what aspects of the claim do, in fact, amount to an inventive concept. (D.I. 55 at 11-14) At one point though, Plaintiff makes reference to claim 13's inclusion of a "follow-up engine"; in doing so, Plaintiff appears to take issue with Defendant's claim that that term is merely a "black box"—i.e., one devoid of limiting structure. (*Id.* at 12) Yet Plaintiff never suggests any proposed claim construction for "follow-up engine" that would require some sort of particularized software or hardware limitations. And when the "follow-up engine" is described in the specification (as "follow-up engine **2004**") it is referred to only in terms of the results it generates (results that basically amount to re-statements of the abstract idea)—not in terms of what it consists of, or how, specifically, it is actually able to generate those results. ('296 patent, cols. 21:55-23:06 (noting that in certain embodiments, "[f]ollow-up engine **2004** can be configured to determine . . . how many of the targeted

_____

[7]        Alleged improvements to the prior art described in a patent's specification and "captured in the claims" can "create a factual dispute regarding whether the invention describes well-understood, routine, and conventional activities"—thus precluding either summary judgment, *Berkheimer*, 881 F.3d at 1369, or dismissal at the Rule 12 stage, *see BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016). Content that creates this type of fact dispute might also be found in a plaintiff's complaint, so long as the complaint's allegations in this regard are not "wholly divorced from the claims or the specification[.]" *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1317 (Fed. Cir. 2019) (citation omitted). Put differently, "[a]s long as what makes the claims inventive is recited by the claims, the specification need not expressly list all the reasons why this claimed structure is unconventional." *Id.*

reviewers authored reviews, and to use that information as feedback in generating messages for additional potential reviewers" or that it "periodically monitors appropriate review sites to determine whether the potential reviewer has created a review" and, if no review has been created, it "determines a follow-up action to take regarding the review request")); *see B# on Demand LLC v. Spotify Tech. S.A.*, 484 F. Supp. 3d 188, 201 (D. Del. Sept. 8, 2020) ("Pointing to a 'proprietary format' essentially points to a black box, which does nothing to demonstrate how the claims are encoded such that they represent an improvement in the technology or innovation over conventional functionality."). So the claim's inclusion of a "follow-up engine" does not save it from ineligibility.[8]

Plaintiff makes one other identifiable step two argument. Quoting from the FAC, it notes that: (1) during prosecution of the '296 patent, the applicant amended the patent's claims in response to a Section 101 rejection; and (2) thereafter, the Examiner concluded that he "no longer believe[d] that the claims are well-understood, routine, or conventional" and that the independent claims of the patent "include specific limitations for improving online reputation by automatically facilitating user reviews on a specified review site, which are not well-understood, routine nor conventional in the field; are integrated into a practical application; and/or add unconventional steps that confine the claim to a particular useful application." (D.I. 33 at ¶ 39 (internal quotation marks omitted) (cited in D.I. 55 at 13); *see also* D.I. 55, ex. A) Plaintiff

---

[8]    The concern that drives the principle that abstract ideas cannot be patented is "one of pre-emption." *Alice*, 573 U.S. at 216. In light of the apparent breadth of claim 13, that concern is heightened here. The Court agrees with Defendant that the claim appears to cover nearly "*every* method for electronically requesting that someone write a review and following up with a different request after a period of time." (D.I. 45 at 9 (emphasis in original)); *see also* Tr. at 248))

asserts that, in light of this, "a fact question exists as to whether, as the Examiner found, the claims are 'significantly more than an abstract idea.'"  (D.I. 55 at 12)

The Court is not persuaded.  Obviously, the fact that the Examiner did not find claim 13 to be patent ineligible is not binding on the Court, and it does not end the Court's inquiry here. *See Elec. Commc'ns Techs., LLC v. ShoppersChoice.com, LLC*, 958 F.3d 1178, 1183 (Fed. Cir. 2020).  Moreover, the Examiner provided no further analysis or explanation in support of his conclusion, other than the few conclusory statements quoted above.  The absence of any factual rationale in support of that conclusion hurts Plaintiff's argument here.  (D.I. 55, ex. A at ¶ 7; Tr. at 246); *cf. S.I.SV.E.L. Societa Italiana per lo Sviluppo Dell'Elettronica S.p.A. v. Rhapsody Int'l, Inc.*, Civil Action No. 18-69-MN-CJB, Civil Action No. 18-70-MN-CJB, 2019 WL 1102683, at *10 (D. Del. Mar. 8, 2019).  But most importantly, the thing that the Examiner is citing as not being "well-understood, routine nor conventional in the field"—i.e., "specific limitations for improving online reputation by automatically facilitating user reviews on a specified review site"—appears to be little more than a re-statement of the abstract idea at issue.  (D.I. 55, ex. A at ¶ 7)  Claim 13 cannot be patent eligible if  "the only possible inventive concept in the [claim] is the abstract idea itself[.]"  *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 775 (Fed Cir. 2019).  And the Court cannot identify any other more "specific limitations" in claim 13 that might amount to the inventive concept here (nor did the Examiner specify what those limitations purportedly were).  For these reasons, the Examiner's bare-bones statement does not help establish a factual dispute at step two.[9]

---

[9]     As is the case with regard to each of the other three patents-in-suit, Plaintiff did not cite to any expert testimony regarding Section 101 issues in the FAC (nor in exhibits attached thereto).  (Tr. at 243)

For all of the reasons set out above, the Court concludes that claim 13 does not contain an inventive concept.  It therefore recommends that the asserted claims of the '296 patent be found to be patent ineligible.

**B.      The '794 Patent**

The '794 patent is entitled "SMS-Based Review Requests."  ('794 patent at 1)  Generally speaking, it relates to directing willing potential review authors where to write a review of a business or company on a specific review website.  The Court will assess the eligibility of claim 19 below, as it finds that claim to be representative.[10]  Claim 19 recites the following:

> **19.**  A method, comprising:
>
> obtaining contact information associated with a potential reviewer;
>
> transmitting, using the obtained contact information, a message requesting the potential reviewer to write a review for an entity;
>
> in response to receiving an indication that the potential reviewer has accepted the request to write the review for the entity, dynamically determining, using one or more processors and from a plurality of review websites, a review website on which the potential reviewer should be directed to write the review for the entity; and
>
> directing a device associated with the potential reviewer to a profile page of the entity on the review website dynamically determined from the plurality of review websites.

('794 patent, col 41:1-16)

**1.      *Alice*'s Step One**

Defendant argues that claim 19 is directed to the abstract idea of "requesting that an individual write a review of a business and, after they accept the request, directing them where

---

[10]      Defendant asserts that claim 19 is representative.  (Defendant's Hearing Presentation, Slide 2)  In its briefing, Plaintiff does not contest that assertion.  (D.I. 55 at 14-18)

they should submit the review."  (D.I. 45 at 11; Tr. at 251; Defendant's Hearing Presentation, Slide 40)  Plaintiff does not dispute that this is an abstract idea.  It counters that the claim is not in fact directed to that idea, and that instead it "represents another improvement to the systems that support online reviews and reputation management systems as a whole."  (D.I. 55 at 14)

At first glance, claim 19 does seem like it is directed simply to "requesting that an individual write a review of a business and, after they accept the request, directing them where they should submit the review."  Most of its text speaks to that broad concept.  That is, as noted above, the claim largely describes (using functional language) how the method:  (1) sends a message to a potential reviewer asking them to write an online review for a specific business; (2) somehow determines the review site on which the reviewer should author a review; (3) somehow directs the reviewer's device to a specific review website, so that he or she can author the review. ('794 patent, col 41:1-16)

The Court next turns to the specification.  In the "Background of the Invention" section, the patent explains that the problem it hopes to solve has to do with getting more business customers to write online reviews:

> Businesses are increasingly concerned with their online reputations.  For example, both positive and negative reviews posted to a review website can impact revenue.  As more review websites are created, and more users post more content to those sites, it is becoming increasingly difficult for businesses to monitor such sites.  Further, it can be challenging for businesses to generate reviews for the business's profile pages.  For example, customers of the business may become busy or find it inconvenient to write reviews.

('794 patent, col. 1:13-21; *see also* Tr. at 270)  Later, the patent notes that "[t]ypically it may be difficult for users to leave reviews, for example, because it is time-consuming to find and open review sites for a business, or because the mobile experience for leaving reviews on a review site

13

is poor." ('794 patent, col. 6:38-42)  And the patent further suggests that "[t]he mechanisms described [in the patent] can reduce the friction in obtaining reviews on mobile devices, encouraging users to write reviews and increasing the conversion rate for a business . . . to generate reviews." (*Id.*, col. 6:42-45; *see also* D.I. 33 at ¶¶ 41, 43)  Here again, the ethos behind the patent seems to be descried in an abstract and fairly high-level way:  i.e., "It sure is hard to get customers to write online reviews for a business.  Let's try to get them to do that."

With all that said, there are other portions of the patent that hint at what could be a more narrow focus.  For example, the title of the patent is "SMS-Based Review Requests."  This indicates that a Short Message Service ("SMS")-based request—rather than just a request sent by any means—might be an important component of what the patent is about.  The specification further notes that "Short Message Service (SMS)/Mobile-Email-based review requests provide a way for entities such as businesses to have reviews on their online business pages by leveraging mobile technology" and that "SMS-based review requests can provide an alternative by leveraging, for example, mobile applications ('apps') installed on an end-user's device together with a business's profile pages to entice or encourage customers to leave a review." ('794 patent, col. 2:31-42)  Moreover, as Plaintiff notes in its briefing, (D.I. 55 at 15), the specification also includes the following language:  "The SMS can be easily opened and links embedded in the SMS clicked on, causing the platform to automatically redirect a mobile device to a business's profile on a review sites/app or website, *thereby reducing the effort and friction in driving users to the business's profiles on review site to leave reviews*." ('794 patent, col. 6:49-54 (emphasis added))  Reading that text, it seems possible that if claim 19 actually required only the use of SMS-based messages with associated links as part of the review direction process, then perhaps

14

that (more specific) real-world application—one that has something to do with how computers work—might impact the Section 101 analysis here.

But claims claim.  And claim 19 is not limited to the use of SMS messages, nor to using links in an SMS message to redirect the user to a review website.  The claim's text does not make reference to SMS messages explicitly.  Nor does it directly reference such links.  Instead, the claim facially requires only that the method "transmit[]" an *unspecified* type of "message" soliciting a review and then later "direct[] a device associated with the potential reviewer to [the dynamically-determined] profile page of the entity on the review website" in some *unspecified* way.  Moreover, if the claim was even arguably limited in these ways, Plaintiff had ample opportunity to tell the Court this.  It could have said so in its answering brief, or argued this during the hearing.  It could have proposed a construction for the "transmitting" or "directing" claim steps to this effect.  But it did not.

Thus, the Court cannot conclude that claim 19 is directed to an "SMS-message-based" request that a review be written, or to a "frictionless" way of directing users to review websites via links sent in SMS messages.  Instead, it appears that the claim is simply directed to the high-level abstract idea proffered by Defendant.

Thus, the Court moves to step two of the analysis.

### 2.  *Alice*'s Step Two

At step two, as it did with the '296 patent, Plaintiff unfortunately makes little attempt to specify *what actually is the purported inventive concept* in claim 19.  (D.I. 55 at 17-18)  For example, in the step two section of its answering brief as to this patent, Plaintiff simply states that:  "[T]he claims are directed to solving problems related to challenges associated with gathering reviews from potential reviewers in order to present those reviews on an online

platform, all toward supporting an accurate and useful assessment of a business's online reputation."  (*Id*.)  That is the language of abstraction, not the language of concrete, real-world application.

Now, in this section of its brief, Plaintiff does again reference the patent's prosecution history in order to suggest the presence of a relevant fact dispute.  (D.I. 55 at 18)  During prosecution, the patentee (citing to an above-referenced portion of the specification) argued that the claims were not invalid under Section 101 because "the elements recite a specific improvement over prior art systems by 'reducing the effort and friction in driving users to the business's profiles on review sites to leave reviews[.]'"  (D.I. 55, ex. C at 9; D.I. 33 at ¶ 50)  In response to this, the Examiner concluded that "the independent claims are . . . 'significantly more' than an abstract idea" and that they "include specific limitations for facilitating user reviews that are not well-understood, routine, nor conventional in the field; are integrated into a practical application; and/or add unconventional steps that confine the claim to a particular useful application."  (D.I. 33 at ¶ 50; D.I. 55, ex. D at ¶ 8)  However, in the prosecution history the patentee never specified what specific elements of the claims were said to "reduc[e] the effort and friction" as to the process of getting users to leave reviews on a review website.  And just as with the '296 patent, the Examiner was also very unspecific about what about the independent claims at issue rendered them "significantly more" than an abstract idea.  The fact that the patentee or the Examiner simply stated a *conclusion* about eligibility during prosecution does not highlight a material dispute *of fact* on the Section 101 question.  And so the prosecution history portion of the record is not helpful to Plaintiff at step two.

This leaves the element of claim 19 that requires "*dynamically determining*, using one or more processors, and from a plurality of review websites, a review website on which the

potential reviewer should be directed to write the review for the entity[.]"  ('794 patent, col. 41:9-12 (emphasis added))  This element was only briefly referenced in Plaintiff's answering brief.  (D.I. 55 at 16, 17)  But at the hearing, Plaintiff's counsel spent a lot of time discussing it.  (Tr. at 271-75)

Does the "dynamically determining" element amount "significantly more" than the abstract idea itself?  If it was arguable that this claim term required something particular regarding the process of dynamic determination—i.e., something that could amount to the unconventional use of computers in order to solve a technological problem (like a particular algorithm that set out how this website selection process gets determined)—than perhaps denial of the Motion would be appropriate as to this patent.  But during the hearing, Plaintiff's counsel confirmed that this was not so.  When asked what "dynamically determining" means, counsel simply offered the following construction:  "having the system determine based on the input where the user should be directed."  (Tr. at 274)  The Court agrees with Defendant that, even were it to adopt this claim construction for the term, the claim element would offer no "concrete limitations [that speak to a claim] directed to a specific technological improvement."  (*Id*. at 253)  The claim would simply require that the method select a review website using any methodology (or no methodology) at all.  Put differently, the element would add nothing to the claim that amounts to an improvement in the way that computers work.  *Cf. In re Greenstein*, 778 F. App'x 935, 939 (Fed. Cir. 2019) (concluding that a patent's claims, which were directed to the abstract idea of providing recommendations for the purchase or lease of good or services, did not contain an inventive concept at step two—despite the presence of a claim step that required insuring that the recommendation was an independent one—as "there is no suggestion that the 'insuring' step requires anything more than conventional data processing performed by a generic computer" and

thus "the claims are broadly directed to [the abstract idea] without offering a technical solution to how one would 'insure' that the data relied on originates from a person who is independent of the transaction").

For these reasons, the Court concludes that claim 19 does not include an inventive concept. And so it recommends that the Motion be granted as to the asserted claims of the '794 patent.

### C.    The '966 Patent

The '966 patent is entitled "Reputation Report with Score." ('966 patent at 1) Generally speaking, it relates to performing an online reputation analysis of an individual and generating a score based on the analysis. (Tr. at 256) The Court will assess the eligibility of claim 18, which it finds to be representative.[11] Claims 18 recites the following:

> **18.** A method, comprising:
>
> performing an automated preliminary coding of a document, wherein the automated preliminary coding of the document is based at least in part on at least one of an amount of time that the document has been available online and a domain from which the document was retrieved;
>
> performing, using one or more processors, an assessment of an online reputation of an individual, wherein the assessment pertains to a particular aspect of the individual's online reputation, and wherein the assessment is performed based at least in part on the automated preliminary coding of the document;
>
> based at least in part on the performed online reputation assessment, generating a reputation score pertaining to the particular aspect of the individual's online reputation; and
>
> providing the reputation score as an output.

---

[11]    Defendant asserts that claim 18 is representative. (Defendant's Hearing Presentation, Slide 2) In its briefing, Plaintiff does not contest that assertion. (D.I. 55 at 18-22)

('966 patent, col. 11:35-52)

### 1.    *Alice*'s Step One

Defendant argues that claim 18 is directed to the abstract idea of "assessing an individual's reputation based on documents about the individual to generate a reputation score." (D.I. 45 at 15; Defendant's Hearing Presentation, Slide 65)  It asserts that this claim covers a method that is similar to "[a person] getting a credit score where you are taking a document, you are assessing a person's reputation, and you are generating ultimately a score," (Tr. at 256), and that "the steps of the claim are analogous to determining an individual's credit score[,]" (D.I. 45 at 16).  More specifically, Defendant argues that, "[a]side from conventional computer concepts, a credit-reporting agency could practice claim 18 by":  (1) "reviewing a financial document and categorizing the document as being relatively more or less impactful to an individual's credit scored based on how old the document is or the source of the document"; (2) "assess[ing] the individual's financial reputation based at least in part on the categorization of [that] financial document"; and (3) then, "[b]ased on the assessment of the individual's financial reputation, the credit-reporting agency could generate a credit score for the individual."  (*Id.*); *see also Mortgage Grader, Inc. v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1324 (Fed. Cir. 2016) (concluding at step one that claims were directed to "anonymous loan shopping[,]" where the steps covered by the claims ("borrower applies for a loan, a third party calculates the borrower's credit grading, lenders provide loan pricing information to the third party based on the borrower's credit grading, and . . . the borrower discloses its identity to a lender") all "could be performed by humans without a computer").

Again here, Plaintiff does not dispute that "assessing an individual's reputation based on documents about the individual to generate a reputation score" is an abstract idea.  Instead it

19

argues that claim 18 is not directed to that idea, but rather "addresses a challenge particular to the Internet, namely online reviews and reputation management" and constitutes an "improve[ment]" to "those systems by solving a problem inherent to them." (D.I. 55 at 19)

In assessing the step one question, the Court again starts with the claim language. In that regard, it is surely true that some of that language overlaps with the abstract idea at issue. For example, the claim certainly is about a method meant to perform an "assessment of an online reputation of an individual[.]" ('966 patent, col. 11:42-43) The method does rely on "document[s]" to do so. (*Id.*, col. 11:36-41) And the method does ultimately "generat[e] a reputation score" based on the document(s). (*Id.*, col. 11:49) That said, there is also more to the claim, as it requires: (1) that an "automated preliminary coding" of a document be performed; (2) that this coding be "based at least in part on at least one of an amount of time that the document has been available online and a domain from which the document was retrieved"; and (3) that the reputation score in turn be based at least in part on "an assessment of an online reputation of an individual" that is "performed based in part on the automated preliminary coding of the document[.]" (*Id.*, col. 11:35-52)

But are these other portions of the claim central to what the claim is directed to, or do they otherwise save the claim at step one? It does not seem so.

That claim 18 is directed to the asserted abstract idea can in part be understood by looking at the rest of the patent. The patent's title ("Reputation Report with Score") suggests a focus simply on the provision of a reputation score itself. ('966 patent at 1) In the specification's "Background of the Invention" section, when it comes to setting out the challenge that the patent intends to address, the patent notes:

> Increasingly, when a first person chooses to learn more about a
> second person, the first person will perform an online search with

20

> respect to the second person.  Unfortunately, the search results may
> be inaccurate or provide an incomplete picture of the second
> person. The first person may make important and potentially
> erroneous decisions about the second person based on the search
> results.

('966 patent, col. 1:13-19)  This indicates that the patent is concerned with weeding out

potentially inaccurate or incomplete information that might make it difficult to assess a person's

"true" reputation.  But the specification (both in this passage and otherwise) never seems to

explain how the patent's solution to that problem is a technological solution.  (D.I. 45 at 18

(Defendant noting that the patent does not recite "a technological solution to a technological

problem"))  Instead, it seems like the focus of the patent is at a much higher level—one that

seems to mesh with the abstract idea at issue ("assessing an individual's reputation based on

documents about the individual to generate a reputation score").

     In its briefing, when Plaintiff attempted to explain what the claim actually is directed to,

it repeatedly emphasized—over and over and over again—that the claim was meant to provide

businesses with "the *objective*, accurate assessment they need[]" by "*objectively* coding" Internet

reviews or by "calculating an *objective* reputation score."  (D.I. 55 at 19 (emphasis added); *see*

*also id.* at 20 (asserting that the patent claims "the generation of an *objective* score" and "applies

an *objective* evaluation") (emphasis added); *id*. at 21 ("claim 18 automates a process in an

*objective* fashion according to previously unused *objective* criteria") (emphasis added); D.I. 33 at

¶ 60 ("The '966 Patent's inventions automate a process in an *objective* fashion, including by

including coding according to *objective* criteria previously unused.") (emphasis added); Tr. at

280; D.I. 57 at 10)  During the hearing on the Motion, the Court followed up on these assertions.

In part, the Court did so because even though claim 18 requires an "automated preliminary

coding" of a document relating to a person's reputation, it seemed at least possible that this

coding process involves a level of subjectivity somewhere along the way.  The word "objective[,]" after all, is not in the claim or the specification.  (Tr. at 280 (Plaintiff's counsel conceding that "[t]here is nothing in the claim or the specification that says objective"); *see also id.* at 259-60)  Indeed, one of the two listed bases in the claim as to how a document can be coded relates to the "domain from which the document was retrieved[.]"  ('966 patent, col. 11:40-41)  It would seem that whether such a domain is preliminarily coded in a positive or negative light could, at some point in that coding process, depend on a person's subjective view about whether the website was in fact "positive" or "negative."  ('966 patent, cols. 3:51-4:11 (explaining that in certain embodiments, a "classifier **214**" and a human work together to preliminarily code a domain as being a "'positive'" or "'negative'" domain, and that a charitable organization's webpage might be deemed a "positive" domain); *see also* D.I. 57 at 10)  Yet in the end, when the Court questioned Plaintiff's counsel about this issue at the hearing, counsel ended up stating that "objective criteria" had nothing to do with why the claim was patentable.  (Tr. at 283-86)[12]

With that issue stripped away, what it seems Plaintiff was really arguing is that the claim is patent eligible at step one because it performs "an *automatic* preliminary coding"—i.e., a

---

[12]     The Court does not agree with Plaintiff's related assertion that the claim here is similar to those at issue in *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299 (Fed. Cir. 2016).  (D.I. 55 at 20; Tr. at 285-86)  In *McRO*, the Federal Circuit found that the representative claim at issue was not directed to the abstract idea of "automated rules-based use of morph targets and delta sets for lip-synchronized three-dimensional animation." 837 F.3d at 1313 (internal quotation marks and citation omitted).  That was because the claimed process used "a combined order of *specific rules* that renders information into a specific format that is then used and applied to created desired results:  a sequence of synchronized, animated characters"— rules that were *different* that what animators were using at the time of the patent for computer automation. *Id.* at 1315 (emphasis added); *see also Ficep Corp.*, 2021 WL 254104, at *3 & n.2. Here, Plaintiff never explains what the analogous computerized "specific rules" or processes are in claim 18 that would mirror the rules at issue in *McRO*, or why those were different than what were used to generate a reputation score in the non-computer context.

process that happens automatically, thanks to the use of a computer.  (D.I. 55 at 20 (emphasis added); *see also* D.I. 33 at ¶ 60 ("The '966 Patent's inventions *automate* a process in an objective fashion . . . .") (emphasis added); '966 patent, col. 3:51-4:11 (describing the coding process beneficial because certain results or classifiers can be coded "automatically"))  But the fact that a computer can perform an abstract idea more quickly and efficiently (i.e., "automatically") than a human could cannot be a reason as to why a claim is directed to a patent eligible concept.  *See Ficep Corp.*, 2021 WL 254104, at *3 ("[I]f a claim simply takes an abstract idea (say, something that humans have done for a long time) and does nothing more than make use of a generic computer to perform the abstract idea faster or more accurately than a human could (the type of 'conventional' function that any computer can make happen), then the claim is ineligible.") (citing cases); *see also supra* Section III.C.2.

For the foregoing reasons, Defendant has demonstrated that the representative claim is directed simply to the abstract idea at issue.

## 2.    *Alice*'s Step Two

At step two, Plaintiff's argument for dismissal of the Motion revolves entirely around the prosecution history.  (D.I. 55 at 21-22)  The FAC notes that during prosecution, the Examiner rejected the claims pursuant to Section 101, but then advised the patentee that:

> "The Examiner believes the 101 rejection can be overcome if the independent claims are amended to include an automated element for preliminary coding of a document as disclosed in the specification (Para 0021); wherein the document is coded based on automated analysis other than simply manually defining/coding search result data by a user – Specification Para (0020-0026)."

(D.I. 33 at ¶ 60; *see also* D.I. 55, ex. E at 5-6 at ¶ 9)  Plaintiff further pleads that:

> The applicant subsequently included such an amendment, which appears in the claims as issued. . . .  The Examiner, after concluding that the claims of the '966 Patent are patent eligible

> under § 101, stated that "the independent claims are considered by
> the Examiner to be 'significantly more' than an abstract idea.
> Independent claims 1, 16, and 20 include specific limitations for
> performing a reputation analysis and generating a reputation report
> that are not well understood, routine, nor conventional in the field;
> and/or adding unconventional steps that confine the claim to a
> particular useful application."

(D.I. 33 at ¶¶ 60-61; *see also* D.I. 55, ex. F at 3 at ¶ 5)

However, the Court cannot see why (and Plaintiff does not ever explain why) adding the word "automated" to claim 18 would save an otherwise patent ineligible claim. As the Court noted above, simply automating the performance of an abstract idea by way of the use of a computer adds nothing to the eligibility calculus. *See Alice*, 573 U.S. at 225 (issuing "automated instructions" is a well-understood, routine activity performed by a computer and cannot amount to an inventive concept); *Credit Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044, 1055 (Fed. Cir. 2017) ("Our prior cases have made clear that mere automation of manual processes using generic computers does not constitute a patentable improvement in computer technology."); *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1363 (Fed. Cir. 2015) ("But relying on a computer to perform routine tasks more quickly or more accurately is insufficient to render a claim patent eligible."); *see also Ficep Corp.*, 2021 WL 254104, at *3. It cannot amount to the asserted inventive concept. (D.I. 57 at 11; Defendant's Hearing Presentation, Slide 81)

The Court cannot otherwise identify an inventive concept in claim 18, and thus it concludes that the claim also fails step two. As a result, the Court recommends that the Motion be granted as to the '966 patent.

### D.   The '312 Patent

The '312 patent is entitled "Assigning Sentiment to Themes." ('312 patent at 1) Generally speaking, it relates to the identification and then subsequent categorization of themes

from a business' online reviews.  (*Id*. at Abstract ("Assigning sentiment to themes is disclosed. . . . For a first review included in the reputation data [which includes user-authored reviews that are extracted from a data source], at least one keyword is determined using the first review's text.  A sentiment is assigned for a theme associated with the keyword based at least in part on the first review's rating."))  The Court will assess the eligibility of claim 16, as it finds it to be representative.[13]  Claim 16 recites the following:

> **16.**  A method, comprising:
>
> receiving reputation data extracted from at least one data source, wherein the reputation data includes user-authored reviews pertaining to an entity and wherein a review comprises text and an accompanying rating;
>
> for a first review included in the reputation data, identifying a theme in the first review that is associated with an aspect of the entity at least in part by determining, using a processor, at least one keyword using the first review's text;
>
> assigning a first sentiment for the identified theme at least in part by using the first review's accompanying rating;
>
> assigning a sentiment for a parent them[e] of the identified theme at least in part by using the first review's accompanying rating;
>
> for a second review included in the reputation data that includes the determined at least one keyword and in which the theme is identified, assigning a second sentiment for the identified theme based at least in part on the second review's accompanying rating; and
>
> providing as output a report that includes the identified theme, a combination of the respective first and second sentiments for that identified theme, the parent theme, and the sentiment for that parent theme.

('312 patent, cols. 33:32-34:14)

---

[13]     Defendant asserts that claim 16 is representative, (Defendant's Hearing Presentation, Slide 2), and Plaintiff does not dispute that in its briefing, (D.I. 55 at 22-25).

1.      ***Alice*'s Step One**

Defendant argues that claim 16 is directed to the abstract idea of "identifying themes in a business's reviews and assigning 'sentiments' (e.g. positive, negative, or neutral) to the themes based on review ratings (e.g., 1 to 5 stars)."  (D.I. 45 at 20; Tr. at 262; Defendant's Hearing Presentation, Slide 87)  Defendant argues that this idea can be, and is, easily practiced outside of the computer context, such as where a market research company performs a survey campaign by similarly:  (1) gathering user-authored reviews; (2) identifying keywords and related themes in those reviews; (3) assigning sentiments (i.e., "positive" or "negative") to the themes based on how many stars the reviewer gave the business; and (4) drafting and providing a report that lists identified themes/parent themes and averages the ratings for those themes, in order to provide an average overall sentiment associated with the themes.  (D.I. 45 at 20-21; *see also* Tr. at 264-65)

Plaintiff does not dispute that "identifying themes in a business's reviews and assigning 'sentiments' (e.g. positive, negative, or neutral) to the themes based on review ratings (e.g., 1 to 5 stars)" is an abstract idea.  But it argues that claim 16 is not directed to that idea.  Instead, Plaintiff asserts that the claim is directed to a technological solution to technological problem.  In explaining why this is so, Plaintiff states that:  (1) at the time of the patent, a business faced the problem that there might be thousands or tens of thousands of online reviews about that business, and any of these reviews could have an impact on a potential customer's view of the business; (2) conventional online review systems lacked the "ability for business[es] to objectively monitor their reputations across all platforms"; and (3) the way the patent attempts to solve this problem is that it "*automates* an *objective* process that receives extracted reputation data[,] identifies a theme based on one or more keywords[] and assigns sentiments, in order to provide an output report."  (D.I. 55 at 22 (emphasis added) (citing D.I. 33 at ¶¶ 62-64); *see also* D.I. 33 at ¶ 64

("[T]he '312 patent *automates* an *objective* process that receives extracted reputation data . . .") (emphasis added))

In light of the Court's comments above with regard to the '966 patent, one can quickly see why Plaintiff's approach here is problematic.

For one thing, claim 16 does not facially include a requirement that the identification of a theme or the assigning of a sentiment must be an entirely "objective" process.  (D.I. 57 at 12)  Indeed, the word "objective" is nowhere to be found in the patent, and at times, the patent describes how, in certain embodiments of the invention, users of a system can (subjectively) customize the keywords and themes that are utilized.  (*Id.*; *see also* '312 patent, col. 27:52-53)  In its briefing, Plaintiff never asserts that claim construction is needed as to any term in claim 16, nor that any such term should have an "objective" requirement built into its construction.

Additionally, for the reasons previously noted above as to the '966 patent, it is of no moment in the Section 101 analysis that the patent "automates" the process of assigning sentiments to themes and then generates a report.  It may well be, as the FAC alleges, that in light of the "enormous amount of information available on diverse and incongruous online sources[,]" manually attempting this type of assignment process was "not viable"—and that automation of that process was thus very helpful.  (D.I. 33 at ¶ 67)  But again, the fact that a claim uses a computer to automate the performance of an abstract idea—making the process go faster or more efficiently than it could if a human were performing it—is not enough to make a difference at *Alice*'s step one.

Beyond that, claim 16's language largely tracks the asserted abstract idea at issue. Additionally, if one sets aside the claim's reference to a generic computer "processor," the method at issue "can be performed entirely in the human mind[.]"  *CyberSource Corp. v. Retail*

*Decisions, Inc.*, 654 F.3d 1366, 1373 (Fed. Cir. 2011); *see also Intellectual Ventures I LLC v.*

*Symantec Corp.*, 838 F.3d 1307, 1318 (Fed. Cir. 2016). This is also a sign that the patent is

directed to an abstract idea, since "computational methods which can be performed entirely in

the human mind are the types of methods that embody the 'basic tools of scientific and

technological work' that are free to all men and reserved exclusively to no one." *CyberSource*

*Corp.*, 654 F.3d at 1373 (citation omitted). And as Defendant notes, (D.I. 45 at 21-22), it is also

correct to say that the claim's focus is on "collecting information, analyzing it, and displaying

certain results of the collection and analysis[,]" which is a patent-ineligible concept. *Electric*

*Power Grp.*, 830 F.3d at 1353-54.[14]

The Court thus finds that claim 16 is directed to an abstract idea. It therefore moves on to

step two.

### 2.    *Alice*'s Step Two

In the portion of its answering brief relating to step two for this patent, Plaintiff argues

that there are "underlying fact questions" that exist as to whether the claim contains an inventive

concept. (D.I. 55 at 24) But Plaintiff never identifies what those "fact questions" are. Instead, it

simply notes that "the Examiner concluded that the '312 patent satisfies [Section] 101." (*Id.*; *see*

---

[14]    At the very end of the step one section regarding this patent in its answering brief,
Plaintiff briefly suggested that claim 16 passes muster because it requires assigning sentiments to
parent themes "that inherently requires performance of a *complex numerical process* to identify
such parent-child relationship among themes." (D.I. 55 at 24 (emphasis added)) But as
Defendant notes, (D.I. 57 at 12), Plaintiff said nothing about: (1) why the language of any
particular claim term might require such a "complex numerical process"; (2) what a claim
construction for such a term might look like in that regard; and (3) what portion of the record
supports such an assertion. If an accused infringer makes an apparently well-founded allegation
of patent ineligibility in a motion to dismiss, a patentee cannot avoid dismissal by simply putting
forward a one-line argument in its briefing and then refusing to provide any supporting details as
to why that argument is a valid one. Thus, this aspect of Plaintiff's answering brief does not save
the claim at step one.

*also* D.I. 33 at ¶ 70; D.I. 55, ex. G)  But the referenced prosecution history contains no information regarding *why* the Examiner thought claim 16 was patent-eligible.  (D.I. 33 at ¶ 70; D.I. 55, ex. G)  And for reasons the Court has already expressed, the Examiner's *bare legal conclusion* about eligibility does not bind the Court, nor is it sufficient (without more) to demonstrate the existence of a material fact dispute at step two.

The Court cannot otherwise identify an inventive concept in claim 16, and thus it concludes that the claim fails step two.  As a result, the Court recommends that the Motion be granted as to the '312 patent.

## IV.  CONCLUSION

For the foregoing reasons, the Court recommends that Defendant's Motion be GRANTED.

In its briefing, Plaintiff sought leave to amend the FAC in order to further address Section 101 issues, were the Court to conclude that some or all of the patents-in-suit were patent ineligible.  (D.I. 55 at 25)  It is not clear to the Court, based on the current record, that Plaintiff could further amend the FAC in a manner that would clear the pleading bar as to one or more of these patents.  (*See* D.I. 45 at 25)  But as a practical matter, the Court's decision herein will likely draw objections from Plaintiff.  And as part of the objections process, if Plaintiff thinks that amendment would be a non-futile act, it can attempt to make the case as to why this is so directly to the District Judge.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2).  The failure of a party to object to legal conclusions may result in the

loss of the right to *de novo* review in the district court.  *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Dated:  January 31, 2022

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE